**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

LISA MACKIE n/k/a LISA SWALLEY,

        Plaintiff,

vs.

U.S. MANUFACTURING, INC., and
GLOBAL RESOURCES RECOVERY
ORGANIZATION, INC.,

        Defendants.

No. C03-85-LRR

**ORDER**

_____

**TABLE OF CONTENTS**

I.  INTRODUCTION AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . 1

II.  FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.  LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    A.  Sex Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    B.  Hostile Work Environment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    C.  Assault and Battery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    D.  Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

### *I. INTRODUCTION AND PROCEDURAL BACKGROUND*

The matter before the court is Defendants' Motion for Summary Judgment (docket
no. 51). The motion is resisted.

On July 7, 2003, Plaintiff Lisa Mackie n/k/a/ Lisa Swalley ("Swalley") filed a
Complaint against Defendants U.S. Manufacturing, Inc. ("USM"), Global Resources

Recovery Organization, Inc. ("Global Resources"), Larry Schacterle ("Schacterle"), and Troy Grover ("Grover"). Swalley invokes this court's jurisdiction pursuant to 28 U.S.C. § 1331, on the basis this lawsuit raises a federal question. As authority, Swalley relies on Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000(e) *et seq.* Swalley also invokes this court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over her state law claims.

Swalley's Complaint alleges four counts. Count I alleges USM, Global Resources, Grover and Schacterle discriminated against her on the basis of her sex and sexually harassed her by creating a hostile work environment in violation of Title VII. Count II alleges USM, Global Resources, Grover and Schacterle discriminated against her on the basis of her sex and sexually harassed her by creating a hostile work environment in violation of the Iowa Civil Rights Act ("ICRA"). Count III alleges Grover committed assault when he attempted to kiss Swalley. Count IV alleges Schacterle committed battery when he approached Swalley from behind and put his hands on her waist without her permission.

On August 15, 2003, USM and Global Resources filed an Answer to Swalley's Complaint. On October 1, 2003, Schacterle filed an Answer to Swalley's Complaint. On October 10, 2003, Grover filed an Answer to Swalley's Complaint.[1] Also on October 10, 2003, Grover filed a motion to dismiss Count I against him because he cannot be held personally liable under Title VII.

---

[1] On September 19, 2003, Swalley moved the court to enter a default judgment against Grover. On October 1, 2003, the Clerk of Court entered default as to Grover. On October 2, 2003, the court held the motion for default judgment in abeyance pending disposition of the case against the remaining defendants. On October 10, 2003, Grover appeared through counsel and moved to set aside the entry of default. On January 9, 2004, the court granted Grover's motion to set aside his default.

On January 29, 2004, Swalley filed an Amended and Substituted Complaint (the "Amended Complaint"). The Amended Complaint realleges Counts I through IV of the Complaint and added two Counts: (1) Count V alleges USM, Global Resources, Grover and Schacterle violated Title VII by retaliating against her after she reported the alleged discrimination based on her sex and the allegedly hostile work environment; and (2) Count VI alleges USM, Global Resources, Grover and Schacterle violated ICRA by retaliating against her after she reported the alleged discrimination based on her sex and the allegedly hostile work environment.

On March 15, 2004, USM and Global Resources filed an Answer to Swalley's Amended Complaint. On March 16, 2004, the court granted Grover's motion to dismiss Count I against him. On March 25, 2004, Grover filed an Answer to Swalley's Amended Complaint.

On June 24, 2004, Swalley and Grover filed a stipulation of dismissal in which Swalley dismissed with prejudice all claims against Grover. On June 25, 2004, Swalley and Schacterle filed a stipulation of dismissal in which Swalley dismissed with prejudice all claims against Schacterle. Therefore, the only remaining defendants are USM and Global Resources ("Defendants").

On December 20, 2004, Defendants filed the pending Motion for Summary Judgment. On February 14, 2005, Swalley resisted such Motion. On March 21, 2005, Defendants filed a reply.[2]

On June 29, 2005, the court held a telephonic hearing on the Motion for Summary Judgment. Attorneys Tricia Hoffman-Simanek and Glenn Johnson appeared on Swalley's behalf. Attorney Sharon Malheiro appeared on behalf of USM. Mark Sherinian appeared

---

[2] On March 31, 2005, the court denied Swalley's motion to file a surreply.

on behalf of Global Resources.  At the end of the hearing, the court indicated this written ruling would follow.

## II.  FACTUAL BACKGROUND[3]

On or about June 3, 2002, Swalley began working for USM as the Director of Strategic Planning/Development.[4]  Swalley was responsible for team building issues for USM.  Loran R. Balvanz is the President of USM.  William DeJong, USM's CEO, was Swalley's immediate supervisor.  Swalley was part of a management team which included Schacterle; Swalley and Schacterle hold equally high positions within USM.  Grover performed work at USM.  The parties dispute whether Grover was an employee of USM or an independent contractor.  Swalley asserts Grover was USM's employee; Defendants contend Grover was merely an independent contractor.  Other relevant employees of USM include Larry Pemberton, a shop floor worker at USM, Paul Gray, a member of management at USM, and Steve Pickens, the shop floor manager supervisor.  None of Pemberton, Gray and Pickens holds a supervisory role over Swalley.

Swalley contends she began to experience difficulties in the workplace in August 2002.[5]  Grover asked Swalley what type of underwear she was wearing.  Swalley contends Grover asked her on at least five occasions what type of underwear she was wearing and asked her on a number of occasions if she was wearing a pair of thong underwear; Defendants contend Grover asked Swalley only once what type of underwear she was

---

[3] The factual background is comprised of the parties' undisputed material facts. Where the facts are disputed, the court sets forth each party's allegations.

[4] Swalley maintains she also worked for Global Resources, which she alleges is USM's sister company.  Defendants contend Swalley never worked for Global Resources.

[5] Unless otherwise indicated, the record is unclear as to what date the alleged comments or actions occurred.

wearing – whether she was wearing a thong pair of underwear.  Grover told Swalley he could see the outline of her body when the sun would shine on her dress.  Swalley contends Grover commented about the name of her then-boyfriend, Kevin Swalley, and asked, "Kevin Swalley, is that like swallow, does that mean that you swallow?"  Swalley further asserts DeJong was present when Grover made the comment linking Kevin's name with the word "swallow."  Defendants deny such statement was ever made and, if it was, Defendants contend DeJong did not take any action following the statement because he believed Swalley was not offended by comments like this.  Defendants maintain DeJong believed Swalley found them to be somewhat funny and acceptable and was not informed otherwise by Swalley.  Swalley asserts Grover asked her whether the "HQN" on her license plate stood for "highly qualified nymph."  Defendants contend Grover does not recall making such a statement.  Swalley alleges Grover made belittling comments, such as referring to Swalley as "Bill's personal assistant," calling her "just a secretary," and making disparaging "blonde" comments to Swalley in front of other employees.  Swalley contends DeJong was present and did nothing when Grover belittled her except to direct Swalley to tell Grover to "knock it off."  Defendants contend Grover does not recall making such comments.  Swalley contends Grover told her that "your ass looks nice in those pants" and said "ooh" beforehand.  Defendants assert Grover does not recall making such a statement.  Swalley contends that in late August 2002, she complained to DeJong about Grover's underwear comments, comments about her backside, and the sundress comment.  Swalley further asserts she told DeJong the comments were inappropriate and made her feel uncomfortable.  Swalley maintains DeJong did nothing in response to her complaints but to state, "Troy was acting like an idiot."  Defendants contend Swalley did not complain to DeJong about the comments until October 9, 2002.  In late August 2002, Grover tried to kiss Swalley once, but she told him she was not interested and he never

tried to kiss her again.

Also in August 2002, Pemberton left a note on Swalley's desk that said, "Lisa, I need to see you, come see me as soon as possible." When Swalley found the note, she spoke to Pemberton, who told her a rumor was circulating that she and Grover were having an affair and her job was in jeopardy as a result. The parties dispute whether the alleged affair would or only might result in Swalley's termination from USM. Swalley maintains Pemberton told her the alleged affair would result in her termination; Defendants contend Pemberton said the alleged affair might result in her termination. Swalley did not think the note was urgent or appropriate. Subsequently, Swalley spoke with DeJong and Balvanz about Pemberton's note and remarks. Swalley received their assurance they were pleased with her work and her job was not in jeopardy. As a result of the incident, Swalley was not allowed on the manufacturing floor of the plant. It is undisputed Swalley did not work on the manufacturing floor. The parties do, however, dispute whether Swalley had other legitimate reasons for passing through the manufacturing floor. Swalley contends she needed to go onto the manufacturing floor for the following reasons: (1) to work with Pickens regarding the safety area of the shop in an effort to update the company's safety program; (2) to help Gray with inventory; (3) to reach the break room that had soda and vending machines; (4) to restock the soda and vending machines in the break room once a week; and (5) to access a storage room for toiletries. Defendants contend that while Swalley may have wished to go onto the manufacturing floor to get to the break room for soda or to a storage room for toilet paper, her job did not require her to do so and it was merely for her convenience.

Swalley alleges that in September 2002 she informed DeJong she was uncomfortable working with Grover in a one-on-one situation. Defendants contend the first time Swalley informed anyone in management, including Balvanz, DeJong, and her Human Resources

Representative, about being uncomfortable or allegedly harassed at work was on October 9, 2002.

Swalley asserts that on October 7, 2002, Schacterle came up from behind her in a copy room and put his hands around her waist; Defendants deny the incident occurred. Swalley asserts she told DeJong about the incident shortly afterward and DeJong did nothing except to inform Swalley to tell Schacterle to "knock it off" if his actions made her uncomfortable. Defendants contend Swalley did not inform anyone in management, including Balvanz, DeJong and her Human Resources Representative, about her belief that she was the object of harassment or discrimination until October 9, 2002.

On October 8, 2002, Swalley was in a management meeting with DeJong and Grover. Swalley contends that during the meeting Grover stated, "I know how you can increase sales. You can go to our customer and say, 'I'll show you this breast if you buy this much product and I'll show you both breasts if you buy this much product.'" Defendants deny the exact quote alleged by Swalley but admit Grover made a statement that he knew how the team could increase sales and motioned at his chest. DeJong did not reprimand Grover following the comment. Defendants contend Swalley did not express any concerns about the comment to DeJong either during the meeting or later in the day and DeJong did not think Swalley was offended by the comment. After Grover's conduct at the meeting, DeJong intended to speak with Grover about his actions and comments but he never did so. It was possible for DeJong to summon Grover immediately at the end of the meeting to talk to him about his actions, but he did not do so. Defendants allege DeJong did not speak with Grover because he got caught up in other events.

On October 9, 2002, Schacterle made a statement to Swalley regarding whether she was wearing crotchless pantyhose. Swalley contends the conversation went thus: when Swalley exited the restroom, Grover, Schacterle and Pickens were standing in a semi-

circle. Schacterle called Swalley over to the group and, when she arrived, he indicated the men had been talking about her. Schacterle revealed a statement Grover apparently made earlier akin to "We've been thinking about you all day. We just have to know, are those crotchless pantyhose you have on?" Swalley responded by calling the men "pigs" and walked away. Grover then stated, "she's a bitch." Defendants deny that Schacterle made the exact comment alleged by Swalley but admit Schacterle made a statement to Swalley that Grover had told him she was wearing crotchless pantyhose. Defendants admit Grover said Swalley was a "bitch" but contend he muttered it as she walked away so the comment was probably not loud enough for her to hear. Subsequently, Swalley informed DeJong about the incident. Swalley contends DeJong stated, "Frankly, Lisa, I don't know how you've put up with it as long as you have." Swalley further alleges she told DeJong that the company needed to implement sexual harassment training, to which DeJong responded, "Those guys don't need sexual harassment training; they know the difference between right and wrong." Defendants deny DeJong made such statements to Swalley. Defendants assert DeJong informed Swalley that he would immediately investigate her complaint. DeJong told Swalley he would speak to Grover and Schacterle about their actions. Swalley contends DeJong did not guarantee her the environment would be safe and free from inappropriate conduct. DeJong suggested Swalley take the rest of the day off. DeJong then called Schacterle and Grover into his office and spoke to them about the incident outside the restroom. DeJong asked them to provide written documentation regarding what had occurred. DeJong spoke with Balvanz about the incident.

On October 10, 2002, Swalley returned to work. That morning, DeJong and Swalley had a meeting about the alleged harassment and Swalley told DeJong she was concerned about returning to work. DeJong asked Swalley what USM could do to enable her to continue working at USM. Swalley told DeJong that Grover's conduct on October

7, 2002, when he suggested using cleavage to increase sales, bothered her. Swalley stated she found one or more of Grover's comments during her employment unacceptable. DeJong offered to terminate Grover and Schacterle so Swalley would continue working at USM. At that time, Swalley did not terminate her position with USM but, at DeJong's suggestion, she decided to take the rest of the week off. DeJong told Swalley she would be paid for her time away from work.

On October 11, 2002, Balvanz called Swalley at home. Swalley contends that during the phone call, Balvanz instructed her to return to work on October 14, 2002; Defendants assert Balvanz merely suggested and encouraged her to return to work on that date. During the same conversation, Balvanz told Swalley, "someone once told me that the reason men wear ties around their necks is because they would look too stupid with them around their penis[es]." Swalley contends Balvanz also said "men are stupid, now, I'm not trying to make excuses for these guys but men are stupid." Swalley further contends she told Balvanz she did not appreciate such comments, especially given the circumstances.

On October 13, 2002, Swalley called DeJong at home and told him she had decided not to return to USM. On October 14, 2002, Swalley returned to work to pick up her personal belongings. As Swalley packed up her belongings, she told DeJong that Grover had tried to kiss her in August. Swalley did not tell DeJong about the incident until she had made her decision to leave USM. Swalley contends she did not inform DeJong earlier of Grover's attempt to kiss her because she already had talked to DeJong about Grover's inappropriate communication at work and nothing had been done about it and because she believed Grover and Balvanz were close friends. Defendants maintain Swalley did not inform DeJong of any inappropriate conduct on Grover's part prior to October 9, 2002. Swalley contends DeJong also told her he understood why she was leaving and if similar

incidents had happened to his wife, he would tell his wife to sue the company and if he were in her situation, he would be very mad. Defendants deny DeJong made such a statement. During the conversation, DeJong told Swalley if she needed a letter of recommendation, to let him know. Swalley contends she believed DeJong would include favorable information about her work performance in the letter of recommendation. DeJong had told Swalley on more than one occasion that she was an "A" player on the team and he thought she did an excellent job.

On October 16, 2002, DeJong wrote Schacterle a disciplinary letter reprimanding him for his actions and warning him that any further violation of USM's sexual harassment policy would result in additional action from USM, including his possible termination. That same date, DeJong wrote Grover a disciplinary letter reprimanding him for his actions, explaining Grover is expected to comply with USM's sexual harassment policy even though he is only a contractor, and warning him that any further violations of USM's sexual harassment policy would result in additional action from USM, including termination of his consulting agreement with USM.

Also on October 16, 2002, Balvanz wrote a letter to Swalley in which he encouraged her to return to work, assured her that if she returned, USM would consider her time away a paid leave of absence and told her, "I view you as a true asset to our team at U.S. Manufacturing, and would like to see you return to your position here." Balvanz apologized for the anecdote he had told her regarding men wearing ties on their penises and explained he told her the story because he had heard it during sexual harassment training. Balvanz informed Swalley that Grover and Schacterle had been disciplined and that any further comments or actions, including any retaliatory comments or actions directed at Swalley, would result in their immediate dismissal. Swalley did not respond to Balvanz's letter.

For several weeks after she left her employment, Swalley sought counseling from her pastor. Swalley also received treatment from Dr. Akbar, a psychiatrist located in Waterloo, and received counseling from Ms. Clemons, a counselor at Dr. Akbar's office.[6] Swalley contends she eventually agreed to take anti-depressants as a result of her treatment with Dr. Akbar.

On November 20, 2002, Swalley filed with the Iowa Civil Rights Commission (the "ICRC") a complaint alleging sex discrimination, which was subsequently cross-filed with the Equal Employment Opportunity Commission (the "EEOC").

Some time after Swalley filed her complaint with the ICRC, Swalley asked DeJong to write her a letter of recommendation.[7] On February 28, 2003, Defendants' attorney wrote a letter to Swalley's attorney, stating she had advised DeJong to write a letter only confirming the dates of Swalley's employment, her salary and job title. If such a letter was agreeable to Swalley, she was to respond to the letter through her attorney. Swalley never responded to Defendants' offer to write a letter verifying her employment.

On April 28, 2003, Swalley filed with the ICRC a complaint alleging retaliation, which was subsequently cross-filed with the EEOC. On or about June 27, 2003, Swalley received a right-to-sue letter from the ICRC. On or about July 18, 2003, Swalley received a right-to-sue letter from the EEOC.

### III. LEGAL ANALYSIS

Summary judgment is appropriate only when the record, viewed in the light most favorable to the nonmoving party, shows there is no genuine issue of material fact and that

---

[6] The parties have not provided to the court the first names of Dr. Akbar or Ms. Clemons or the name of the pastor with whom Swalley sought counseling.

[7] The parties do not indicate on what approximate date Swalley made the request.

the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Carter v. Ford Motor Co.*, 121 F.3d 1146, 1148 (8th Cir. 1997) (citing *Yowell v. Combs*, 89 F.3d 542, 544 (8th Cir. 1996)). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). A fact is material when it is a fact that "might affect the outcome of the suit under the governing law." *Rouse v. Benson*, 193 F.3d 936, 939 (8th Cir. 1999). In considering a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Id.*

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel*, 953 F.2d at 394 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and, by depositions, affidavits or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The Eighth Circuit Court of Appeals "'has repeatedly cautioned that summary judgment should seldom be granted in the context of employment actions, as such actions are inherently fact based.'" *Keathley v. Ameritech Corp.*, 187 F.3d 915, 919 (8th Cir. 1999) (quoting *Hindman v. Transkrit Corp.*, 145 F.3d 986, 990 (8th Cir. 1998)).

12

"'[S]ummary judgment should not be granted unless the evidence could not support any reasonable inference of discrimination.'" *Id.* (quoting *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir. 1999) (internal quotation marks and other citations omitted)).

## A. Sex Discrimination[8]

Counts I and II of the Amended Complaint allege Defendants discriminated against Swalley on the basis of her sex by banning her from going out onto the manufacturing floor of the plan due to her gender. Count I alleges a violation of Title VII; Count II alleges a violation of ICRA. As a preliminary matter, the court notes that in considering Swalley's sex discrimination claims, the court generally will make no distinction between claims based on federal law and comparable claims based on state law. This is appropriate because the Iowa Supreme Court has recognized that federal precedent is applicable to discrimination claims under the ICRA, Iowa Code chapter 216. *See Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999) ("The ICRA was modeled after Title VII of the United States Civil Rights Act."). Iowa courts, therefore, traditionally turn to federal law for guidance in evaluating the ICRA. *King v. Iowa Civil Rights Comm'n,* 334 N.W.2d 598,

---

[8] Swalley appears to make separate claims of (1) sex discrimination and (2) sexual harassment based on hostile work environment in both Counts I and II of her Amended Complaint. The parties do not specifically address Swalley's sex discrimination claims in their briefs regarding summary judgment. However, it is clear Defendants move for summary judgment on all claims presented and wish the court to dismiss the case in its entirety. The facts relevant to Swalley's sex discrimination claims are already before the court. Therefore, the court will address Swalley's sex discrimination claims to determine whether there exist any genuine issues of material fact for trial. *See Stone Motor Co. v. Gen. Motors Corp.*, 400 F.3d 603, 607 (8th Cir. 2005) ("A district court may grant summary judgment sua sponte if 'the losing party was on notice that she had to come forward with all of her evidence.'") (quoting *Celotex Corp v. Catrett*, 477 U.S. 317, 326 (1986)).

601 (Iowa 1983). Thus, the court addresses both claims based on sex discrimination together. *See Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1048-49 (8th Cir. 2005) ("Because the Iowa Civil Rights Act mirrors federal law, the analysis [under Title VII] also disposes of the ICRA claims.") (citing *Mercer v. City of Cedar Rapids*, 308 F.3d 840, 845 (8th Cir. 2002)).

There are two methods by which a plaintiff can demonstrate intentional discrimination based on sex under Title VII and ICRA. First, the plaintiff may provide "direct evidence of conduct or statements by persons involved in the decision-making process, which indicate a discriminatory attitude was more likely than not a motivating factor in the employer's decision." *Id.* at 1046 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989)).

> If there is direct evidence of sex discrimination, the burden rests with the employer to show that it more likely than not would have made the same decision without consideration of the illegitimate factor. [*Price Waterhouse*, 490 U.S. at 258.] Evidence of the employer's motives for the action, and whether the presence of a [sic] mixed motives defeats the plaintiff's claim, is a trial issue, not intended for summary judgment. *Griffith v. City of Des Moines*, 387 F.3d 733, 735 (8th Cir. 2004).

*Id.* Second, if the plaintiff has no direct evidence of discrimination, the plaintiff may present indirect evidence of discrimination, employing the framework originally set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* "The *McDonnell Douglas* framework exists to provide discrimination plaintiffs a way to prove their case when they do not have explicit, inculpatory evidence of discriminatory intent." *Id.* (citations and internal quotation marks omitted). Under the *McDonnell Douglas* burden-shifting analysis, a plaintiff must first establish a prima facie case of sex discrimination. *Id.* (citing *Shannon v. Ford Motor Co.*, 72 F.3d 678, 682 (8th Cir. 1996)). If the plaintiff

succeeds in making a prima facie showing of discrimination, the burden shifts to the employer to "proffer a legitimate, nondiscriminatory reason for the adverse action." *Id.* (citing *Shannon*, 72 F.3d at 682). "'This is a burden of production not proof. The [employer] need not persuade the court, it must simply provide evidence sufficient to sustain a judgment in its favor.'" *Id.* (quoting *Krenik v. Count of Le Sueur*, 47 F.3d 953, 958 (8th Cir. 1995)). If the employer meets its burden of production, the burden shifts back to the plaintiff to prove the employer's "'proffered reason is pretextual and that intentional discrimination was the true reason for the [employer's] actions.'" *Id.* (quoting *Krenik*, 47 F.3d at 958, in turn citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).

Swalley has no direct evidence of discrimination; thus, her sex discrimination claims are evaluated under the *McDonnell Douglas* burden-shifting analysis. *See id.* "To establish a prima facie case of sex discrimination, [the plaintiff] must demonstrate she: (1) is a member of a protected class; (2) was qualified to perform her job; (3) suffered an adverse employment action; and (4) was treated differently than similarly situated persons of the opposite sex." *LaCroix v. Sears, Roebuck, & Co.*, 240 F.3d 688, 693 (8th Cir. 2001). The Eighth Circuit Court of Appeals has recognized adverse employment actions in the context of sex discrimination claims include:

> tangible changes in duties or working conditions that result in a material employment disadvantage. It includes actions such as termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, or disadvantage or interfere with the employee's ability to do his or her job. It may also include a transfer to a less desirable position because that position afforded little opportunity for salary increases or advancement.

*MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 930 & n.5 (8th Cir. 2004) (holding the

district court's instruction to the jury correctly exemplifies adverse employment action for purposes of a claim of sex discrimination). Adverse employment action does not include mere inconvenience, an alteration of job responsibilities or loss of status and prestige when salary and position remain the same. *Id.* at 930.

In this case, Swalley contends the adverse employment action was that she "was banned from going onto the manufacturing floor of the plant due to her gender." Amended Complaint at 9. It is undisputed Swalley did not work on the manufacturing floor. Thus, viewing the facts in the light most favorable to Swalley, the court finds Swalley would go onto the manufacturing floor of the plant for the following reasons: (1) to work with Pickens regarding the safety area of the shop in an effort to update the company's safety program; (2) to help Gray with inventory; (3) to reach the break room that had soda and vending machines; (4) to restock the soda and vending machines in the break room once a week; and (5) to access a storage room for toiletries. While the alleged ban may have inconvenienced Swalley or altered her job responsibilities, such action does not amount to a tangible change in her duties or working conditions that resulted in a material employment disadvantage. *See MacGregor*, 373 F.3d at 930. There is no evidence Swalley was reprimanded for failing to perform her safety, inventory or restocking duties or that she received a cut in pay or benefits for failing to perform those duties. In other words, the alleged ban did not amount to an adverse employment action. Thus, Swalley has failed to establish an essential element of a prima facie case of sex discrimination: that she suffered an adverse employment action. *See LaCroix*, 240 F.3d at 693. Because Swalley has failed to show even a prima facie case of sex discrimination, the court need not apply the full burden-shifting analysis of *McDonnell Douglas*. *See Kratzer*, 398 F.3d at 1046.

The court finds there are no genuine issues of material fact regarding Swalley's sex

discrimination claims and Defendants[9] are entitled to judgment as a matter of law. Therefore, the court grants summary judgment in Defendants' favor on Swalley's sex discrimination claims contained in Counts I and II of Swalley's Amended Complaint.

### B. Hostile Work Environment

Counts I and II of Swalley's Amended Complaint also allege she suffered sexual harassment based on a hostile work environment. Again, in considering Swalley's hostile work environment claims, the court generally will make no distinction between claims based on federal law and comparable claims based on state law. Therefore, the court addresses both claims based on hostile work environment together. *See Kratzer*, 398 F.3d at 1048-49.

Swalley's hostile work environment claims are evaluated under the *McDonnell Douglas* burden-shifting analysis. *See Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792 (8th Cir. 2004) (citing *Breeding*, 164 F.3d at 1156; *Hoover v. Norwest Private Mortgage Banking*, 632 N.W.2d 534, 542 (Minn. 2001)).

> To establish a prima facie case on a hostile work environment sexual harassment claim, the Plaintiff must prove: (1) that she was a member of a protected group, (2) the occurrence of unwelcome harassment, (3) a causal nexus between the harassment and her membership in the protected group, (4) that the harassment affected a term, condition, or privilege of employment, and (5) that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action.

*Id.* (citing *Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir. 1999)). The nexus

---

[9] Because the court must construe all facts in the light most favorable to Swalley, *see Matsushita Elec. Indus. Co.*, 475 U.S. at 587, the court assumes for purposes of deciding Defendants' Motion for Summary Judgment that Swalley worked for both USM and Global Resources.

requirement relating the harassment to the plaintiff's sex "forces a plaintiff to prove she was the target of harassment because of her sex and that the offensive behavior was not merely non-actionable, vulgar behavior." *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1068 (8th Cir. 2005). The Eighth Circuit Court of Appeals has recognized the "distinction [between actionable and non-actionable behavior] exists because 'Title VII does not prohibit all verbal or physical harassment in the workplace' and is not 'a general civility code for the American workplace.'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). "Consequently, to succeed on a hostile work environment claim under Title VII, a plaintiff must show 'that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "discrimina[tion] . . . because of . . . sex."'" *Id.* (quoting *Oncale*, 523 U.S. at 81, in turn quoting 42 U.S.C. § 2000e-2(a)(1)) (alterations and omissions in original). In order to be actionable,

> the harassment must be both objectively and subjectively offensive, such that a reasonable person would consider it to be hostile or abusive, and courts make this determination by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Erenberg*, 357 F.3d at 792 (quoting *Breeding*, 164 F.3d at1158, in turn quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)) (quotation marks omitted). "'Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive - is beyond Title VII's purview.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "'Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of

employment.'" *Id.* (quoting *Breeding*, 164 F.3d at 1158). Furthermore, "'[s]poradic use of abusive language, gender-related jokes, and occasional teasing are the ordinary tribulations of the workplace, and as such, they do not amount to actionable harassment.'" *Id.* at 792-93 (quoting *Breeding*, 164 F.3d at 1159). Merely offensive, unprofessional or immature conduct does not rise to the level of actionable harassment capable of establishing a prima facie case of hostile work environment. *Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021, 1027 (8th Cir. 2004). The conduct must be extreme, "not merely rude or unpleasant." *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003) (citing *Faragher*, 524 U.S. at 788; *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 934 (8th Cir. 2002)).

In this case, the parties agree Swalley has met the first three elements of her claims: (1) Swalley is a member of a protected group; (2) she suffered unwelcome harassment; and (3) the harassment was based on her sex. *See Erenberg*, 357 F.3d at 792-93.[10] Thus, the parties' dispute focuses on the last two elements of the prima facie case of hostile work environment: (4) whether the harassment affected a term or condition of Swalley's employment; and (5) whether Defendants failed to take prompt and remedial action once they knew or should have known about the harassment. *See id.*

The Eighth Circuit Court of Appeals recently has addressed several hostile work environment claims under Title VII in which it concluded the statements and conduct were insufficient to demonstrate the harassment affected a term or condition of the plaintiff's employment, the fourth element of a prima facie case of hostile work environment. First,

---

[10] Defendants assume Swalley has met the first three elements only for purposes of their Motion for Summary Judgment. Defendants reserve the right to contest the second element (i.e., that the harassment was unwelcome) at trial in the event they do not prevail on their Motion.

the Eighth Circuit Court of Appeals concluded a plaintiff's hostile work environment claim failed because although her supervisor's "comments and actions were inappropriate, immature and unprofessional, they did not cross the high threshold required to support a claim of sexual harassment" where the evidence showed: (1) the plaintiff's supervisor's requests she go out with him were repetitive and annoying but not lewd or threatening; (2) her supervisor did not touch her inappropriately or make sexual comments about her in her presence; (3) the plaintiff's supervisor's phone calls to her in the middle of the night asking her out and expressing interest in her did not contain sexual propositions; and (4) although her supervisor's conduct made her uncomfortable, the plaintiff was able to continue to perform her assignments and his actions did not result in a change to her work status. *Henthorn*, 359 F.3d at 1027-28.

Second, the Eighth Circuit Court of Appeals affirmed the district court's grant of summary judgment in the employer's favor where the plaintiff alleged a hostile work environment based on the following facts: (1) she was called "Malibu Barbie" by coworkers on two or three occasions; (2) other employees exchanged backrubs in the workplace; (3) other employees told sexual jokes in the workplace; and (4) a female coworker placed her hands on male employees' shoulders, arms and backs. *Erenberg*, 357 F.3d at 792-93. The court determined the behaviors the plaintiff complained of, in the moderate amounts she alleged they occurred, "[did] not show that hers was a workplace 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" *Id.* at 793 (quoting *Harris*, 510 U.S. at 21).

Third, the Eighth Circuit Court of Appeals determined a plaintiff's claim for hostile work environment failed as a matter of law where: (1) male employees made derogatory comments to the plaintiff; (2) she was called offensive names; (3) men received preferable

treatment; and (4) male workers stared at female employees while they worked. *Kratzer*, 398 F.3d at 1047-48. Without addressing whether the facts constituted actionable conduct, the court determined the plaintiff's subjective belief she was not harassed was fatal to her Title VII sexual harassment claim. *Id.*

Fourth, the Eighth Circuit Court of Appeals affirmed the district court's grant of summary judgment in the employer's favor where the plaintiff alleged a hostile work environment on the following three events: (1) the plaintiff's supervisor asked him to watch pornographic movies together and to masturbate to relieve stress; (2) his supervisor again mentioned pornographic movies; suggested the plaintiff would advance within the company if he watched the movies and performed sex acts on the supervisor; his supervisor kissed him on the mouth, grabbed his buttocks and reached for his genitals; and (3) the plaintiff's supervisor briefly grabbed plaintiff's thigh during a meeting. *LeGrand v. Area Res. for Cmty. & Human Servs.*, 394 F.3d 1098, 1102 (8th Cir. 2005). Specifically, the court found "[n]one of the three incidents was physically violent or overtly threatening" and, although the actions and statements were "manifestly inappropriate," the court held "the three isolated incidents, which occurred over a nine-month period, were not so severe or pervasive as to poison [the plaintiff's] work environment." *Id.* at 1102-03.

Fifth, the Eighth Circuit Court of Appeals determined a plaintiff's claim for hostile work environment failed as a matter of law where: (1) the plaintiff's supervisor made regular references to "old ladies"; (2) her supervisor did not allow her to participate in a training session because it was "too hard to train old ladies"; (3) her supervisor once commented that the plaintiff "didn't have the right parts" to fill in shifts; and (4) a coworker once commented that women were lazy and were not needed at the jail (where the plaintiff worked). *Peterson v. Scott County*, 406 F.3d 515, 524 (8th Cir. 2005).

Specifically, the court held, "[t]hese appear to be the type of isolated incidents, teasing and offhand comments which, while offensive, do not reach the level of harassment." *Id.* (citing *Gipson v. KAS Snacktime Co.*, 171 F.3d 574, 579-80 (8th Cir. 1999); *Wallin v. Minn. Dep't of Corr.*, 153 F.3d 681, 688 (8th Cir. 1998)).

The Eighth Circuit Court of Appeals has determined "pervasive sexual innuendo and repetitive offensive touching" are sufficient to establish a hostile work environment. *Baker v. John Morrell & Co.*, 382 F.3d 816, 828 (8th Cir. 2004); *see, e.g., Eich v. Bd. of Regents for Cent. Mo. State Univ.*, 350 F.3d 752, 755-56 (8th Cir. 2003) (finding conduct sufficiently severe when plaintiff was frequently touched in numerous suggestive ways and was subject to simulated sex acts); *Beard v. Flying J, Inc.*, 266 F.3d 792, 797 (8th Cir. 2001) (affirming judgment for plaintiff where a coworker brushed, rubbed and flicked her breasts and pointed to his crotch); *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 838 (8th Cir. 1998) (describing a co-employee constantly making sexual innuendos, brushing up against plaintiff and telling lewd jokes with gestures); *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1262-63 (8th Cir. 1997) (reversing summary judgment for the employer where plaintiff faced consistent ridicule and derogatory comments about women, even though they were not sexually explicit); *Hathaway v. Runyon*, 132 F.3d 1214, 1217-18 (8th Cir. 1997) (finding a jury reasonably ruled for plaintiff when she was subject to two instances of offensive touching, followed by constant snickering and guttural noises from two other employees).

In one recent case, the Eighth Circuit Court of Appeals affirmed the trial court's denial of summary judgment in favor of the employer and affirmed the jury's award based, in part, on a hostile work environment claim. *Baker*, 382 F.3d at 828-29. The evidence presented at trial regarding the plaintiff's hostile work environment claim included the following: (1) the plaintiff was subjected to sexual and other derogatory remarks and

sexual conduct by coworkers on a daily basis during the nearly seventeen years she worked for the employer; (2) one coworker threw boxes full of meat at her which hit her on several occasions; (3) the plaintiff's foreperson refused to investigate any of her complaints regarding her coworkers' conduct and exacerbated the problem by forcing the plaintiff to wait long periods of time to use the bathroom even though she had a medical condition which required her to frequently need to use the bathroom; male coworkers were allowed to use the bathroom as soon as they asked to do so; (4) the plaintiff repeatedly complained to her union representatives and her foreperson's supervisor but the harassment continued; (5) the plaintiff suffered from anxiety, depression and hypertension due to the harassment and she experienced panic attacks as a result;[11] (6) the plaintiff began seeing a psychiatrist for her physical and mental distress resulting from the harassment she experienced daily at work. *Id.* at 819-27. The Eighth Circuit Court of Appeals had "little difficulty concluding the evidence was sufficient to support the jury's verdict [regarding hostile work environment]. The lengthy factual recitation . . . chronicles years of blatant sexual harassment leaving no doubt [the plaintiff] was subjected to conduct so severe and pervasive as to create an objectively hostile and abusive work environment." *Id.* at 828-29.

Likewise, the Eighth Circuit Court of Appeals reversed the district court's order granting the employer's motion for summary judgment on the plaintiff's hostile work environment claim where the evidence showed: (1) the chair of her department repeatedly made harassing or discriminatory comments to the plaintiff based on her gender, including calling her and other female anesthesiology residents by their first names while referring

---

[11] "Showing some tangible psychological condition is not necessary to make out a hostile work environment claim, but it may be taken into account." *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 722 (8th Cir. 2003) (citing *Harris*, 510 U.S. at 22-23).

to the male residents as "doctor"; (2) male residents informed the plaintiff the chair had told them he hired her to fill his female quota in order to avoid discrimination charges; (3) male residents told her "you girls are here because it's about time he hired some good looking girls"; (4) the chair and male residents at various times told the plaintiff she was attractive, a "beautiful young lady," and should consider modeling; (5) the chair referred to her and another female resident as the "anesthesiology babes"; (6) the chair complained several times he was "stuck with [the plaintiff] again" and "had to work with another female resident"; (7) in the operating room and in the doctor's lounge, the chair asked the plaintiff why she had gone into medicine rather than nursing or getting married, why she was so assertive and why she polished her nails; (8) the chair opined to her that women ought to be married and home nursing babies and compared her unfavorably to the wife of another doctor who stayed home to raise their children; (9) the chair suggested to the plaintiff that she would not be able to find a husband because of her age and medical training; (10) the chair altered his rotation schedule so he would be around the plaintiff so he could subject her to additional ridicule; (11) the plaintiff was hospitalized twice as a result of the stress from the chair's harassment; and (12) she suffered emotional trauma and frequent crying because of the harassment. *St. Louis Univ.*, 109 F.3d 1261.

The court finds the harassment Swalley experienced was not sufficiently hostile or abusive to be actionable. Swalley bases her hostile work environment claims on the following allegations: (1) Grover attempted to kiss her once; (2) Schacterle put his hands on her waist once; (3) Pemberton left a note on her desk stating he needed to speak with her as soon as possible; (4) Balvanz recounted to Swalley a joke he heard during sexual harassment training about men wearing neckties on their penises; and (5) Grover made sexual and gender-based comments to her on several occasions. The court finds these allegations are akin to the cases in which the Eighth Circuit Court of Appeals has deemed

the evidence insufficient to show harassment. The court believes the conduct was offensive and unprofessional. However, the conduct was merely tinged with offensive sexual connotations rather than being objectively hostile, based on the frequency, severity and content of the statements. *See Pedroza*, 397 F.3d at 1068; *Erenberg* 357 F.3d at 792. The court finds the behaviors Swalley complains of, in the moderate amounts she alleges they occurred, "do not show that hers was a workplace 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [Swalley's] employment and create an abusive working environment.'" *Erenberg*, 357 F.3d at 793 (quoting *Harris*, 510 U.S. at 21). Furthermore, Swalley's contention that "DeJong did not guarantee the environment would be safe and free from inappropriate conduct" does not create a genuine issue of material fact for trial. *See Pedroza*, 397 F.3d at 1068 (recognizing "'Title VII does not prohibit all verbal or physical harassment in the workplace' and is not 'a general civility code for the American workplace'") (quoting *Oncale*, 523 U.S. at 80). Thus, even viewing the facts in the light most favorable to Swalley, the court finds Swalley has failed to establish an essential element of a prima facie case of hostile work environment: that the harassment affected a term, condition or privilege of her employment. *See id.* at 792. Because Swalley has failed to show even a prima facie case of sexual harassment, the court need not apply the full burden-shifting analysis of *McDonnell Douglas*. *See Kratzer*, 398 F.3d at 1046.

Defendants have demonstrated there are no genuine issues of material fact regarding Swalley's hostile work environment claims and they are entitled to judgment as a matter of law, which Swalley has failed to rebut. Therefore, the court grants summary judgment in Defendants' favor on Swalley's hostile work environment claim contained in Counts I and II of Swalley's Amended Complaint.

### C. Assault and Battery

Count III alleges Grover committed assault against her when he attempted to kiss her; Count IV alleges Schacterle committed battery against her when he placed his hands around her waist. Both Counts allege Defendants created an atmosphere which allowed the assault and battery and Grover and Schacterle committed the state common law torts while acting in the scope of their employment. Swalley did not state whether she intended to dismiss those Counts in their entirety when she dismissed Grover and Schacterle from the case. Defendants moved for summary judgment on Counts III and IV, alleging there is no genuine issue of material fact and they are entitled to judgment as a matter of law as to Swalley's assault and battery claims. Swalley did not resist Defendants' Motion as it related to Counts III and IV. Therefore, the court will determine whether summary judgment is appropriate.

Defendants contend the remedies provided by ICRA are exclusive and preempt any state common law tort claims which are based on the same conduct and which, in light of the pleadings, require the plaintiff to prove discrimination in order to prevail. *See Greenland v. Fairtron Corp.*, 500 N.W.2d 36, 38 (Iowa 1993).[12] Furthermore, Defendants contend that, unless they commanded or expressly authorized the alleged assault and battery, they are not responsible for the intentional torts committed by an employee against another employee. *See Nelson v. Winnebago Indus., Inc.*, 619 N.W.2d

---

[12] Because the court's jurisdiction over these state law claims is based on its supplemental jurisdiction found in 28 U.S.C. § 1367(a), the court must look to Iowa law regarding ICRA's preemption of common law claims, assault, battery, and the extent of an employer's vicarious liability for an employee's alleged commission of those torts. *See Catipovic v. Peoples Cmty. Health Clinic, Inc.*, 401 F.3d 952, 957 n.7 (8th Cir. 2005) (recognizing the district court entertained the plaintiff's state tort claim pursuant to its supplemental jurisdiction and thus applied state substantive law to the merits of the claim).

385, 387-88 (Iowa 2000). It is undisputed Defendants did not command or expressly authorize the alleged assault and battery.

The court finds Defendants' arguments to be persuasive. Defendants have demonstrated there is no genuine issue of material fact as to whether they are liable as to Counts III and IV. Thus, even if Swalley did not intend to dismiss Counts III and IV against Defendants when she dismissed Grover and Schacterle, the court finds it appropriate to grant summary judgment in Defendants' favor as to Counts III and IV of Swalley's Amended Complaint. *See* Fed. R. Civ. P. 56(e) (requiring the nonmoving party to go beyond the pleadings and, by depositions, affidavits or otherwise, designate "specific facts showing that there is a genuine issue for trial" once the moving party has met its burden of demonstrating there are no genuine issues of material fact).

### D. Retaliation

Counts V and VI of the Amended Complaint allege retaliation. Count V alleges a violation of Title VII; Count VI alleges a violation of ICRA. Again, in considering Swalley's retaliation claims, the court generally will make no distinction between claims based on federal law and comparable claims based on state law. Therefore, the court addresses both claims based on retaliation together. *See Kratzer*, 398 F.3d at 1048-49.

Like her claims based on sex discrimination and hostile work environment, Swalley's retaliation claims are evaluated under the *McDonnell Douglas* burden-shifting analysis. *Erenberg*, 357 F.3d at 793. "To establish a prima facie case for retaliation, the Plaintiff must show that (1) she filed a charge of harassment or engaged in other protected activity; (2) her employer subsequently took an adverse employment action against her; and (3) the adverse action was causally linked to the protected activity." *Id.* Each alleged retaliatory action must be so adverse it created a material change in the plaintiff's employment: "a change in salary, benefits, or responsibilities" is sufficient to establish

27

an actionable retaliation claim. *Henthorn*, 359 F.3d at 1028. While an adverse employment action in the context of a retaliation claim may be something other than termination, "not everything that makes an employee unhappy is an actionable adverse action." *Baker*, 382 F.3d at 829 (quotation and quotation marks omitted). "'Changes in duties or working conditions that cause no materially significant disadvantage . . . are insufficient to establish the adverse conduct required to make a prima facie case.'" *Id.* (quoting *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994)). Thus, the Eighth Circuit Court of Appeals determined a reasonable jury could conclude that a negative reference to a potential employer constitutes an adverse employment action on which a plaintiff may base an actionable retaliation claim. *Id.* at 829-30 (citing *St. Louis Univ.*, 109 F.3d at 1266). However, the Eighth Circuit Court of Appeals determined the loss of status and prestige resulting from a change in a supervisor's staff, while maintaining the same salary and position, does not constitute an actionable adverse employment action. *Id.* at 830 (citing *Ledergerber v. Stangler*, 122 F.3d 1142 (8th Cir. 1997)). "An inference of a causal connection between a charge of discrimination and termination can be drawn from the timing of the two events." *Peterson*, 406 F.3d at 524 (citing *Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 818 (8th Cir. 1998); *St. Louis Univ.*, 109 F.3d at 1266). However, generally "more than a temporal connection is required to present a genuine factual issue on retaliation." *Id.* (citing *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc)).

In this case, viewing the facts in the light most favorable to Swalley, the court finds Swalley filed a complaint with the ICRC and EEOC and reported the alleged sex discrimination and hostile work environment to management. Defendants concede for purposes of their Motion for Summary Judgment that Swalley reasonably believed she was reporting harassing behavior when she talked to management on October 9, 2002, and,

therefore, that she was engaged in a protected activity.[13] *See Erenberg*, 357 F.3d at 793. Therefore, the dispute focuses on the second and third elements of the prima facie case of retaliation: (2) whether Defendants took adverse employment action against Swalley; and (3) whether such adverse employment action was causally linked to Swalley's reporting of the alleged sex discrimination and hostile work environment to management. *See id.*

The Eighth Circuit Court of Appeals has addressed several retaliation claims filed pursuant to Title VII. First, the Eighth Circuit Court of Appeals concluded a plaintiff's retaliation claim failed where she alleged her employer refused to test her for a particular job and later offered to test her in exchange for dropping her complaint with the ICRC. *Kratzer*, 398 F.3d at 1048. The Eighth Circuit Court of Appeals determined the plaintiff failed to demonstrate (1) her employer took adverse employment action against her and (2) any causal link between her complaint to the ICRC and the alleged adverse employment action. *Id.* Specifically, the court held the plaintiff presented no evidence the failure to test was related to her complaint with the ICRC. *Id.* Furthermore, the court found the employer's offer to test her in exchange for dismissing the ICRC complaint was an inadmissible settlement offer. *Id.*

Second, the Eighth Circuit Court of Appeals determined a plaintiff's retaliation claim failed where the adverse employment actions, several verbal and written warnings, three-day suspension and eventual termination, were not causally connected to the

---

[13] Defendants assert Swalley did not report to management any sex discrimination or hostile work environment prior to October 9, 2002; Swalley contends she informed management of the alleged sex discrimination and hostile work environment prior to that date. In deciding a motion for summary judgment, the court must construe all disputed facts in favor of the non-moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Therefore, the court will assume Swalley reported the alleged sex discrimination and hostile work environment as she contends.

grievance she filed at work and her complaint to management. *Erenberg*, 357 F.3d at 793. Specifically, the court noted the plaintiff received at least four warnings that her work performance was unsatisfactory before she complained about the alleged hostile work environment. *Id.*

The Eighth Circuit Court of Appeals has held prima facie claims of retaliation sufficient in other circumstances. For example, where the plaintiff, an interim employee, complained of discrimination on November 20 and she was terminated on December 4, the court determined the timing established causation sufficient to prove a prima facie claim of retaliation. *Peterson*, 406 F.3d at 524-25. Furthermore, the court noted the employer had written on his calendar for November 20 a note to call someone regarding the dismissal of an interim employee. *Id.* at 525. There was no evidence any interim employee other than the plaintiff was dismissed around the time the plaintiff was discharged. *Id.* Thus, the Eighth Circuit Court of Appeals determined the fact finder should decide whether the note more likely referred to the plaintiff or some other employee and held the plaintiff proved a prima facie case of retaliation. *Id.*

In a case in which the Eighth Circuit Court of Appeals reviewed the jury verdict in favor of the plaintiff, the court found the plaintiff demonstrated her supervisor became antagonistic towards her because her complaint to the ICRC reflected badly on the supervisor's job performance. *Baker*, 382 F.3d at 830. Specifically, the supervisor limited her bathroom and other breaks, added to her job duties, refused to provide her with necessary job assistance, repeatedly yelled at her for making mistakes, withheld privileges granted to other employees and attempted to dissuade her from making further complaints. *Id.* The Eighth Circuit Court of Appeals held the "retaliatory changes in working conditions constituted significant and material disadvantages sufficient to support the retaliation claim." *Id.*

In this case, Swalley has failed to demonstrate Defendants took adverse employment action against her. Viewing the facts regarding Swalley's retaliation claim in the light most favorable to Swalley, the court finds the following: (1) when she informed management of Pemberton's note, she was banned from the manufacturing floor of the plant; (2) Grover belittled her privately and in front of others after she rebuffed Grover's attempt to kiss her; and (3) when she asked for a letter of recommendation, she expected an exemplary letter of recommendation but instead was offered a letter simply verifying her employment. First, regarding the ban from the manufacturing floor, the court finds such action did not constitute an adverse employment action.[14] *See Baker*, 382 F.3d at 829 (recognizing changes in duties or working conditions that cause no materially significant disadvantage are insufficient to establish the adverse conduct required to make a prima facie case of retaliation). Second, with regard to Swalley's contention Grover began belittling her in private and in front of others after she rebuffed his advances, the court finds such conduct does not create an actionable adverse employment action: Grover's conduct is not so adverse it created a material change in Swalley's employment. *See Henthorn*, 359 F.3d at 1028; *see also Baker*, 382 F.3d at 829 (holding not everything that makes an employee unhappy is an actionable adverse action). Finally, the undisputed material facts show Swalley was not promised a letter of recommendation in any particular form and she was not promised an exemplary letter rather than a simple letter verifying Swalley's employment. An employer has no duty to write letters of recommendation; letters verifying employment (rather than reciting the employee's work performance) are

---

[14] The court previously found the alleged ban does not constitute adverse employment action for purposes of proving Swalley's sex discrimination claim. The court now finds it also does not constitute adverse employment action for purposes of proving Swalley's retaliation claim.

often standard practice. This is not a situation in which the employer provided a negative reference to a potential employer. *See Baker*, 382 F.3d at 829-30 (citing *St. Louis Univ.*, 109 F.3d at 1266). Therefore, the court finds DeJong's failure to write the letter of recommendation Swalley wished he had written was not an adverse employment action.

Swalley also alleges she was constructively discharged from her employment in retaliation for her complaints regarding the alleged sex discrimination and sexual harassment. "'[C]onstructive discharge is but one incident by which an employee can demonstrate an adverse [employment] action.'" *Tatum v. City of Berkeley*, 408 F.3d 543, 551 (8th Cir. 2005) (quoting *MacGregor*, 373 F.3d at 928) (alterations in original). "Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable, thereby forcing her to quit." *Baker*, 382 F.3d at 829 (citing *Klein v. McGowan*, 198 F.3d 705, 709 (8th Cir. 1999)). Whether the conditions are intolerable is judged objectively rather than based on the subjective feelings of the employee. *Id.* (citing *Gartman v. Gencorp Inc.*, 120 F.3d 127, 130 (8th Cir. 1997)). "First, the conditions created by the employer must be such that a reasonable person would find them intolerable. Second, 'the employer's actions must have been taken with the intention of forcing the employee to quit.'" *Id.* (internal citations omitted). If the employer denies making a conscious effort to force the employee to quit, the court must hold the employer to have intended the reasonably foreseeable consequences of the employer's actions. *Id.* (citing *Hukkanen v. Int'l Union of Operating Eng'rs Hosting & Portable Local No. 101*, 3 F.3d 281, 285 (8th Cir. 1993)). "Finally, 'to act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly'; therefore, 'an employee who quits without giving [her] employer a reasonable chance to work out a problem has not been constructively discharged.'" *Id.* (quoting *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 498 (8th Cir. 1995)).

The undisputed material facts show DeJong asked Swalley what USM could do to keep her as an employee and he offered to terminate Grover and Schacterle so she could keep working for USM without being harassed. Additionally, after Swalley quit, Balvanz wrote a letter to her in which he stated that if she returned to work by October 21, 2002, her time away would be considered paid leave.[15] The court cannot say a reasonable person would find the conditions Defendants created to be intolerable. Furthermore, the court cannot say Defendants' actions were taken with the intention of forcing Swalley to quit. On the contrary, the evidence shows DeJong and Balvanz tried to work with Swalley so she could continue to work for USM without being harassed. The court finds this is a case in which Swalley quit without giving Defendants a reasonable chance to work out the problem. *See id.* (quoting *West*, 54 F.3d at 498). Therefore, the court finds Swalley's constructive discharge claim fails due to the absence of an adverse employment action.

Even viewing the facts in the light most favorable to Swalley, the court finds Swalley has failed to prove an essential element of a prima facie case of retaliation: that Defendants took adverse employment action against her. *See Erenberg*, 357 F.3d at 793. Because Swalley has failed to show even a prima facie case of retaliation, the court need not apply the full burden-shifting analysis of *McDonnell Douglas*. *See Kratzer*, 398 F.3d at 1046.

Defendants have demonstrated there are no genuine issues of material fact regarding

[15] Swalley contends she believed she was terminated when Balvanz told her to return to work on October 14, 2002 and she did not do so. The court finds Swalley's belief she was terminated does not amount to constructive discharge. First, Swalley already had quit her job before Balvanz asked her to return to work. Furthermore, in light of the other evidence regarding DeJong's and Balvanz's statements to Swalley in mid-October 2002, a reasonable person would not find Defendants created intolerable working conditions by asking Swalley to return to work and they did not intend to force Swalley to quit.

Swalley's retaliation claims and they are entitled to judgment as a matter of law, which Swalley has failed to rebut. Therefore, the court grants summary judgment in Defendants' favor on Counts V and VI of Swalley's Amended Complaint.

## *IV. CONCLUSION*

For the foregoing reasons, **IT IS HEREBY ORDERED**:

(1)     Defendants' Motion for Summary Judgment (docket no. 51) is **GRANTED**.

(2)     Plaintiff's Complaint is **DISMISSED** with prejudice.

(3)     All court costs are assessed against Plaintiff.


**SO ORDERED.**

**DATED** this 29th day of June, 2005.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA